UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA :
:
v. : Cr. No. 17-cr-00068
:
RICHARD WOODHEAD :

MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION
FOR COMPASSIONATE RELEASE

Mr. Woodhead is incarcerated at FCI Elkton, where there is a substantial risk he will contract COVID-19. He suffers from several medical conditions including type 2 diabetes, high cholesterol, arrhythmia and heart failure. Mr.Woodhead's pre-existing conditions make him acutely vulnerable to experiencing severe illness or death from COVID-19. He is scheduled to complete his 60-month sentence on March 12, 2021. Based on Mr. Woodhead's participation in programs, the Bureau of Prisons (BOP) recommended he be placed in a residential reentry center or on home confinement in early September 2020; that date has been delayed due the suspension of programming. These considerations present extraordinary and compelling reasons to modify Mr. Woodhead's sentence and grant compassionate release consistent with § 3582(c)(1)(A) and § 3553(a). It is further respectfully requested that the Court consider this motion on an expedited basis.

**BACKGROUND**

Mr. Woodhead, age 57, is incarcerated at the low security federal correctional institution located at 8730 Scroggs Road in Lisbon, Ohio 44432  (FCI Elkton). Mr. Woodhead is serving a five-year sentence for the attempted receipt of child pornography (18 U.S.C. § 2252(a)(2)). ECF No. 44. He was arraigned on a criminal complaint on

1

April 4, 2017. After a bond hearing on April 12, 2017, Mr. Woodhead was released on an unsecured bond with certain conditions. ECF No. 17, 18. In July 2017, Mr. Woodhead and the government entered into a written plea agreement. ECF No. 26. On August 18, 2017, the Court accepted Mr. Woodhead's guilty plea to a single count Information after accepting a waiver of Indictment. Minute entry for proceedings held on 8/18/2017.

On December 15, 2017, the Court held sentencing proceedings for Mr. Woodhead. The government and Mr. Woodhead's counsel recommended the mandatory minimum five-year term of imprisonment, which was higher than the sentencing guideline recommended term of 46 to 57 months. Transcript, ECF No. 84 at 19, L13-16; PSR, ECF No. 38 at ¶ 90. The Court accepted the joint recommendation and imposed the statutorily required five-year prison term. ECF No. 84 at 19, L13-16. In addition to the term of imprisonment, Mr. Woodhead is subject to ten years of supervised release with special conditions including participation in mental health and sex offender treatment, substance abuse testing as well as the monitoring and unannounced examination of his computers and electronic equipment. Id. at 5.

On April 18, 2020, Mr. Woodhead submitted an administrative request for compassionate release/reduction in sentence to Warden Mark R. Williams. Exhibit A at 1. Among other things, Mr. Woodheads cited, as extraordinary and compelling reasons, the impact of the novel coronavirus ("COVID-19") at FCI Elkton and his pre-existing medical conditions that pose a significant risk he will experience severe complications should he contract COVID-19. Id. On April 27, 2020, Warden Williams denied Mr. Woodhead's administrative request. Id. at 2.

Mr. Woodhead is scheduled to complete the custodial portion of his sentence on March 12, 2021. Exhibit B at 2. Based on Mr. Woodhead's programming schedule, his individualized reentry plan recommended that he be placed in a residential reentry center/home confinement on September 11, 2020. Id. That date has been indefinitely delayed due to the suspension of programming at FCI Elkton. Upon release, Mr. Woodhead plans to reside with his wife in Lee County, Florida or with his father in Bristol County, Massachusetts.

**APPLICABLE LAW**

The passage of the First Step Act in 2018 changed the process by which § 3582(c)(1)(A) compassionate release occurs. See P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018). Under 18 U.S.C. § 3582(c)(1)(A)(i), courts need not await a motion from the Director of BOP to resentence prisoners for "extraordinary and compelling reasons." Importantly, the reasons that can justify resentencing need not involve only terminal illness or urgent dependent care for minor children.

Congress first enacted the modern form of the compassionate release statute, codified at 18 U.S.C. § 3582, as part of the Comprehensive Crime Control Act of 1984. Section 3582(c) states that a sentencing court can reduce a sentence whenever "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). In 1984, Congress conditioned the reduction of sentences on the BOP Director's filing of an initial motion to the sentencing court. Absent such a motion, sentencing courts had no authority to modify a prisoner's sentence for compassionate release. Id.

Congress never defined what constitutes an "extraordinary and compelling reason" for resentencing under Section 3582(c). But the legislative history to the statute gives an indication of how Congress thought the statute should be employed by the federal courts. The Senate Committee stressed how some individual cases, even after the abolishment of federal parole, still may warrant a second look at resentencing:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

S. Rep. No. 98-225, at 55-56 (1983) (emphasis added).

Congress initially delegated the responsibility for outlining what could qualify as "extraordinary and compelling reasons" to the U.S. Sentencing Commission ("Commission"). See 28 U.S.C. § 994(t) ("The Commission . . . shall describe with the very general guidance that "extraordinary and compelling reasons" may include medical conditions, age, family circumstances, and "other reasons." U.S.S.G. § 1B1.13, app. n. 1(A). In November 2016, after a negative DOJ Inspector General report found that the BOP rarely invoked its authority under the statute to move for reduced sentences, the Commission amended its policy statement on "compassionate release" See U.S.S.G. § 1B1.13 Amend. (11/1/2016); See U.S. DOJ, Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program, I-2023-006 (Apr. 2013). The Commission concluded that reasons beyond medical illness, age, and family circumstances could qualify as "extraordinary and compelling reasons" for resentencing. Id., n.1(A) (including a category for "Other Reasons," when there is "an extraordinary

and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).").

## THE GLOBAL PANDEMIC

According to the World Health Organization, the novel coronavirus that causes COVID-19 has led to a global pandemic.[1] As of August 18, 2020 there were more than 21,900,00 reported COVID-19 cases throughout the world and over 170,548 deaths in the United States.[2] At the outset of the pandemic, the New York Times explained why jails are a much more dangerous place to be than even a cruise ship.[3]

COVID-19 is "highly infectious and can be transmitted easily from person to person. . . . Fatality rates increase with age and underlying health conditions such as cardiovascular disease, respiratory disease, diabetes, and immune compromise." Wilson, et al. v. Williams, et al., No. 20-3447 at 3 (Sixth Cir. June 9, 2020) (also found at Wilson, et al. v. Williams, et al., Case No. 4:20-cv-00794-JG, ECF No 117 at 3 (N.D. Ohio)). COVID-19, if contracted, can cause severe complications or death especially for patients with high risk factors. Id.

Despite the reported efforts of the BOP, the spread of the virus has been particularly acute within the federal prison population. The charts below display the rate

---

[1] WHO Characterizes COVID-19 as a Pandemic, World Health Organization (March 11, 2020), available at https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen

[2] COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University, available at https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6

[3] See An Epicenter of the Pandemic Will Be Jails and Prisons, If Inaction Continues, The New York Times (March 16, 2020), at https://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.html

of infection within the BOP population compared with the rate in the general population

in the United States and other nations, as of August 10, 2020:



COVID-19 Rate of Infection for Various Populations

| Location | Cases | Population | Infections/ 1,000 People | Infection Rate as % of Population |
|---|---|---|---|---|
| **BOP Imprisoned Population** | 10,937[4] | 142,071 | 76.98 | 7.6983% |
| **United States** | 5,063,770 | 330,099,864 | 15.34 | 1.5340% |
| **China** | 88,862 | 1,394,015,977 | 0.06 | 0.0064% |
| **Italy** | 250,825 | 62,402,659 | 4.02 | 0.4019% |

| | BOP has an infection rate X times higher |
|---|---|
| **Compared to the United States** | 5.02 |
| **Compared to China** | 1207.66 |
| **Compared to Italy** | 19.15 |

https://federaldefendersny.org/ (citing original data sources).

---

[4] Includes the number of BOP inmates who have tested positive for COVID-19, the number of BOP inmates who have recovered, and the number of BOP inmates who have died from COVID-19. Numbers obtained from www.bop.gov/coronavirus on a daily basis. There is good reason to believe that the numbers reported by the BOP understate the actual number of tested-positive cases. Compare M. Licon-Vitale, MCC Ward, and D. Edge, MDC Warden, Response to EDNY Administrative Order 2020-14 (Apr. 7, 2020) at https://www.nyed.uscourts.gov/pub/bop/MDC_20200407_042057.pdf (3 positive inmates at MDC Brooklyn) with COVID-19 Cases Federal Bureau of Prisons (Apr. 7, 2020) at www.bop.gov/coronavirus (2 positive inmates at MDC Brooklyn).

The unparalleled health crisis in our country and in our prisons presents "extraordinary and compelling reasons" to grant compassionate release or a reduction in sentence even where the movant is housed at a facility that reports no COVID-19 outbreak.[5] In a host of cases, courts have held extraordinary and compelling reasons exist even where the medical history was void of pre-existing medical conditions that present a higher risk of suffering sever complications or death from COVID-19.[6] This may be, in part, related to early recognition by courts that prisons are "a hotbed for spreading

---

[5] United States v. Regas, No. 391CR00057MMDNA1, 2020 WL 2926457, at *3 (D. Nev. June 3, 2020)("The fact that there are no confirmed COVID-19 cases at Herlong is not reassuring, given that there is no facility-wide testing[.]"); United States v. Schafer, No. 6:18-CR-06152 EAW, 2020 WL 2519726, at *2 (W.D.N.Y. May 18, 2020) ("[W]ithout knowing the percentage of the prison population that has been tested, the fact that there are no positive COVID-19 cases provides little insight into whether the virus has reached the facility."); United States v. Burrill, No. 17-CR-00491-RS-1, 2020 WL 1846788, at *2 (N.D. Cal. Apr. 10, 2020) ("Federal correctional institutions, which had reported zero COVID-19 cases only weeks ago, and despite the steps the BOP has taken to contain the disease within its facilities, are now reporting numerous virus-related deaths.") (citations omitted).

[6] United States v. Kelly, 13-CR-59-CWR-LRA, (DE 145: 1 & 13) (S.D. Miss. May 1, 2020) (granting compassionate release to an individual in his late 20s without health issues where BOP failed to control the outbreak of COVID-19 at his facility); United States v. Chestnut, 09-CR-06071-DGL-MWP, (DE 925) (W.D.N.Y. Apr. 29, 2020) (granting compassionate release request despite the fact that Mr. Chestnut was not vulnerable based on a compromised immune system or pre-existing medical condition, (see DE 922: 10)); United States v. Vazquez, 18-CR-20530-Ungaro, (DE 294: 1, n.1) (S.D. Fla. Apr. 13, 2020) (recommending to BOP that the defendant serve his remaining sentence on home confinement where the defendant was in his late 30s and did not claim to suffer from any health that increased his risk of illness from COVID-19); see also United States v. Barkman, 19-CR-00052-RCJ-WGC, 2020 WL 1811343 (D. Nev. Mar. 17, 2020) (suspending the defendant's intermittent confinement, because of the risks of being incarcerated during the pandemic even though the defendant did not allege that he fell within any particularly vulnerable age or health class, (see DE 20)); United States v. Barkman, 19-CR-00052-RCJ-WGC, Doc. No. 27 (D. Nev. Apr. 17, 2020) (further extending the suspension of the defendant's intermittent confinement in light of ongoing nature of pandemic).

COVID-19 among incarcerated individuals," as noted in a recent clinical study in Michigan.[7]

Prisoners who contract COVID-19 are more likely to have severe clinical presentation, higher rates of ICU admissions and mortality rates. Id. According to clinical data:

> Compared to non-prisoners, prisoners were more likely to present with fever, tachypnea, hypoxemia, and markedly elevated inflammatory markers. Prisoners were more commonly admitted to the intensive care unit (ICU) (26.9% vs. 18.7%), required vasopressors (24.1% vs. 9.9%), and intubated (25.0% vs. 15.2%). Prisoners had higher unadjusted inpatient mortality (29.6% vs. 20.1%) and 30-day mortality (34.3% vs. 24.6%). In the adjusted models, prisoner status was associated with higher in-hospital death (odds ratio, 1.95; 95% confidence interval (CI), 1.07 to 3.57) and 30-day mortality (hazard ratio, 1.92; 95% CI, 1.24 to 2.98). Id.

## COVID-19 and FCI ELKTON

FCI Elkton "is a low-security security prison…." Wilson, ECF No. 117 at 3 (Sixth Circuit decision). The prison is designed to house approximately 2,000 inmates in the main facility and 500 inmates in a satellite facility. At the main facility, there are three buildings with dormitory-style housing units. Each unit houses approximately 300 inmates split between two sides. At the satellite facility, there are two units, each with approximately 250 inmates. There are approximately 150 bunks on each side of a unit where, generally, two to three inmates share a cube and sleep a few feet away from each other. Id.

In April, four Elkton inmates petitioned the United States District Court for the Northern District of Ohio to seek "release from custody to limit their exposure to the

---

[7] Vivek Kak, M.D., FACP, et al., Comparative Clinical Outcomes and Mortality in Prisoner and Non-Prisoner Populations Hospitalized with COVID-19: A Cohort from Michigan (August 11, 2020).

COVID-19 virus." Wilson, ECF No. 117 at 2 (Sixth Ci.t decision). Pursuant to 28 U.S.C. § 2241, petitioners also sought relief for all current and future inmates including those who are "particularly vulnerable to complications, including death, if they contracted COVID-19." Id.

The district court entered a preliminary injunction requiring the warden of FCI Elkton and the Bureau of Prisons (BOP), in relevant part, to identify inmates at Elkton who, based on guidance from the Center for Disease Control (CDC), are at higher risk of experiencing severe COVID-19 complications. Wilson, ECF No. 22, 12, 20 (N.D. Ohio, April 22, 2020); See Exhibit C. As a result of the preliminary injunction, the BOP identified 837 medically vulnerable inmates at FCI Elkton including Mr. Woodhead. Id. at 5; See Exhibit D.

The Sixth Circuit assessed the risk of COVID-19 at FCI Elkton and concurred with the district court's finding that inmate housing at Elkton poses a "substantial risk of serious harm" to medically vulnerable inmates. Wilson, ECF No 117 at 13 (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)). The BOP has acknowledged "[t]he health risks posed by COIVD-19 are significant." Wilson, ECF No 117 at 13 (Sixth Cir. decision quoting Appellant BOP's brief). For medically vulnerable people, COVID-19 "creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death." Id. (Sixth Cir. decision) Despite the BOP's efforts, "[t]he infection and fatality rates at Elkton have borne out the serious risk of COVID-19." Id. The transmissibility of COVID-19, FCI Elkton's dormitory-style housing—which places inmates within feet of each other—and the health risks of medically vulnerable inmates "presents a substantial

9

risk that petitioners at Elkton will be infected with COVID-19 and have serious health effects as a result, including, and up to, death." Id.

Recently, the Elkton petitioners were granted expedited discovery by the district court and the matter is ongoing. See Wilson, ECF. No. 174 (N.D. Ohio, August 6, 2020). The most recent status report from FCI Elkton indicates that rapid COVID-19 tests, conducted on an as needed basis, yielded 62 positive results out of 583 tests since May. Id., ECF No. 184 (N.D. Ohio, August 20, 2020); See also Id., ECF No. 81. Ongoing mass testing has also yielded 969 positive results out of 6,339 tests since May. Id.

## ARGUMENT

With the changes made to the compassionate release statute by the First Step Act, instead of depending upon the BOP Director to determine an extraordinary circumstance and move for release, a court can now resentence "upon motion of the defendant," after the inmate has exhausted administrative remedies with the BOP, or after 30 days from the receipt of the inmate's request for compassionate release with the warden of the defendant's facility, whichever comes earlier. 18 U.S.C. § 3582(c)(1)(A).

Courts are now authorized to consider a defendant's motion, even one which the BOP opposes, and order resentencing if the court finds that "extraordinary and compelling reasons" warrant a reduction and such a reduction is consistent with the Section 3553(a) factors. Id. Resentencing courts are also advised that any decision to reduce a previously ordered sentence be "consistent with applicable policy statements issued by the Sentencing Commission." Id.

Here, Mr. Woodhead as exhausted his administrative remedies due to the warden's denial of Mr. Woodhead's administrative request for compassionate release/reduction in sentence.

Mr. Woodhead's medical history includes current diagnoses of type 2 diabetes mellitus, hyperlipidemia (high cholesterol), cardiac arrhythmia and heart failure. Exhibit E at 15 (filed under seal). The CDC recognizes each of these as conditions that increase the risk of severe illness from COVID-19.[8] Mr. Woodhead also suffers from essential (primary) hypertension, which the CDC recognizes may increase the risk of severe illness from COVID-19. Id.

Should he contract COVID-19, Mr. Woodhead's pre-existing medical conditions place him at a high risk of experiencing severe illness or death from COVID-19. A "COVID-19 infection has many manifestations that are not solely limited to the respiratory system.[9] Although the respiratory system is the main target, COVID-19 reportedly affects renal, neurological, immune and cutaneous systems. Id.

Public health officials warn "infection control is challenging" in a setting such as FCI Elkton.[10] Mr. Woodhead, is "at special risk of infection, given [his] living

---

[8] People With Certain Medical Conditions, CDC (August 15, 2020), at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

[9] Rola Husain, MB, BCh, BAO, et al., Rhabdomyolysis as a manifestation of a severe case of COVID-19: A case report (July 7, 2020), at https://doi.org/10.1016/j.radcr.2020.07.003

[10] Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States (March 2, 2020), at https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf

situation[]," and is "less able to participate in proactive measures to keep [himself] safe." Id.

Even in correctional settings with "crowded living conditions," social distancing is critical to preventing the transmission of COVID-19.[11] "Social distancing is the practice of increasing the space between individuals and decreasing their frequency of contact to reduce the risk of spreading a disease." Id. Ideally, individuals should maintain at least 6 feet from each other, even those who are asymptomatic. Id. "Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19." Id. The BOP has a "limited availability of single-cell bed space" and, generally, at institutions that house prisoners with higher security classifications than those living at FCI Elkton. Exhibit F, Declaration at ¶ 29-30. The BOP has also conceded that medically vulnerable prisoners such as Mr. Woodhead would face other hardships and safety concerns if it were to transfer him from FCI Elkton to an institution that can accommodate optimal social distancing. Id. at ¶ 29-39.

Another consideration is the suspension of programming at FCI Elkton, which has indefinitely delayed if/when the BOP will administratively transfer Mr. Woodhead to a residential reentry center or home confinement. Despite his enrollment, Mr. Woodhead may not be able to complete the BOP's residential drug treatment program (RDAP) until FCI Elkton resumes normal operation. If Mr. Woodhead completed the RDAP program

---

[11] Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, Centers for Disease Control and Prevention (CDC) (Updated July 22, 2020).

12

as scheduled, the BOP's recommendation was that he be transferred to a residential reentry center or home confinement in early September. Exhibit B at 2.

## RELEVANT § 3553(a) FACTORS

When extraordinary and compelling reasons are established, the Court must then consider the relevant sentencing factors in §3553(a) to determine whether a sentencing reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). In this case, a review of the Section 3553(a) factors and Mr. Woodhead's proposed release plan favor granting his release.

Mr. Woodhead had no criminal history prior to the instant offense. PSR, ECF No. 38 at ¶ 47-51. He served in the Army before spending over thirty years in public service to the City of Attleboro, Massachusetts. Id. at ¶ 62. He maintains the strong family ties summarized in the presentence report. See Id. at ¶ 64-66. His wife of over thirty years and his twin adult children continue to be supportive.

While Mr. Woodhead's conduct involved a sex offense, it did not involve physical violence or sexual contact. Notwithstanding the joint recommendation that the Court impose the mandatory minimum, at sentencing, defense counsel and the government proffered varying accounts of Mr. Woodhead as an individual and of the offense conduct. The Court took note of the arguments of defense counsel that Mr. Woodhead was "acting out of a fantasy," which was supported by the opinion of Mr. Woodhead's therapist. Sentencing Transcript, ECF No. 84 at 20.

The government characterized Mr. Woodhead as having an alter ego and proffered an appropriate sentence warranted heavy consideration of two 3553 factors- "protection of the public and deterrence." Id. at 9. The government argued Mr. Woodhead was not acting out of fantasy and posited that further investigation may have

led to evidence that Mr. Woodhead intended to act out the fantasy. Id. at 20. The Court considered he government's arguments and noted, "[a]ll we can do is speculate about that." Id.

Mr. Woodhead expects the government will offer similar objections to his compassionate release. However, the Court already declined to "sentence [Mr. Woodhead by] speculating on what might have happened or what might have been." Id. The Court also noted, "sentencing can't be done on speculation." Id.

Where the Court does factor in protecting the public from "what ifs" and "maybes" is when it determines the parameters of supervised release. Id. at 21. When released, Mr. Woodhead will be required to undergo mental health and sex offender treatment, random substance abuse testing and polygraphs or similar methodology to measure his compliance. Judgment, ECF No. 4 at 5. He will also be subject to unannounced examinations of his computers and electronic equipment, and is prohibited from contacting anyone under 18 without the approval of a probation officer. Id. Mr. Woodhead submits the Court has already considered the 3553 concerns he expects the government will offer in opposition hereto. In its consideration of those factors, the Court imposed "very stringent conditions" of supervised release that "will help law enforcement in ensuring that [Mr. Woodhead will not] cross that line and that the public is protected." Id.

## CONCLUSION

Congress's expansion of the compassionate release statute by § 603(b) of the First Step Act reflects congressional intent for courts to have greater flexibility to reduce sentences when compelling circumstances justify a later review. The title of the

amendment, "Increasing the Use and Transparency of Compassionate Release," accentuates that intent. The evolving case law also demonstrates that courts have construed their discretion generously to effectuate Congressional desire to increase the use of the compassionate release statute encouraged by this amendment.

It bears reiterating, as the Sixth Circuit stated in its assessment of the health crisis at Elkton, COVID-19 is "highly infectious and can be transmitted easily from person to person. . . . Fatality rates increase with age and underlying health conditions." Wilson, ECF No. 117 at 3 (Sixth Cir. decision). COVID-19, if contracted, could cause severe complications or death especially for Mr. Woodhead, who has high risk factors. See Id. But for COVID-19, the BOP likely would release Mr. Woodhead from FCI Elkton in the coming weeks. These considerations present extraordinary and compelling reasons in favor of granting Mr. Woodhead's release consistent with § 3582(c)(1)(A) and § 3553(a)

For the foregoing reasons, Mr. Woodhead respectfully requests that the Court grant him an expedited hearing; grant his motion and order his release.

RICHARD WOODHEAD,<br>
By His Attorney,

DATED: AUGUST 21, 2020     /s/ J. Dixon-Acosta, Esq. (#8692)
215 Broadway
Providence, RI 02903
P: (401) 272-3900
F: (401) 234-1367
jadaesq@gmail.com

CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of August, 2020, I electronically filed a copy of this document with the electronic filing system of the U.S. Dist Ct. for the Dist. of R.I.

/s/ J. Dixon-Acosta, Esq.